***********
The undersigned have reviewed the record and the prior Decision and Order filed by Deputy Commissioner Hall. The Full Commission REVERSES the decision of the Deputy Commissioner and enters the following Decision and Order:
 ***********
The undersigned finds as facts and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. The parties are subject to the jurisdiction of the North Carolina Industrial Commission.
2. This is a claim for damages under the North Carolina Tort Claims Act.
3. It is hereby stipulated by and between the parties that the following medical evidence and other documentary evidence shall be entered into evidence: 1) Medical records from Mission-St. Joseph's Hospital dated July 3, 1999, consisting of 18 pages; 2) Medical records from Mission-St. Joseph's Hospital dated July 4, 1999, consisting of 17 pages; 3) Report of Investigation by Medical Examiner dated July 9, 1999, consisting of 10 pages; 4) North Carolina Department of Correction medical records consisting of 14 pages; 5) Medical records from St. Joseph's Urgent Care dated July 1997 and medical records from Hot Springs Health Program dated August 4, 1994, consisting of 2 pages; 6) Medical examiner's certificate of death; 7) North Carolina Department of Correction Inmate Summary record re: Garland Ray Sawyer consisting of 8 pages; 8) Internal Investigation Report prepared by Clifford Johnson, Superintendent of Buncombe Correction Center, dated July 8, 1999, with attachments consisting of 80 pages; 9) Letters sent by Garland Ray Sawyer to his family while incarcerated consisting of 88 pages; 10) Four photographs of Garland Ray Sawyer; 11) Defendant's Responses to Plaintiff's Request for Admission; 12) Copies of bills received from Carolina Mountain Emergency Medicine and Asheville Radiology Associates totaling $475.00; 13) Bill/receipt from Bowman Funeral Home in the sum of $6,399.20; 14) Bill/receipt from Martin Monuments in the sum of $1,200.00; 15) Copies of Garland Ray Sawyer's tax returns and W-2 forms; and 16) Entry from Defendant's Inmate Rule Book Governing Medical Services.
 ***********
Based upon the evidence of record, the Full Commission enters the following:
 FINDINGS OF FACT
1. At the time of his death, Garland Ray Sawyer was 28 years old and had an eighth grade education. The Clerk of Superior Court of Madison County, North Carolina appointed his mother, Sandra Dale Helton, as Administratrix of the Estate of Garland Ray Sawyer on August 19, 1999.
2. On April 20, 1999, Garland Ray Sawyer pled guilty to involuntary manslaughter of his wife, Melinda. Mr. Sawyer was sentenced to a minimum of 13 months and a maximum term of 16 months in the North Carolina Department of Correction.
3. Mr. Sawyer was transferred to Buncombe Correctional Center on June 1, 1999 and confined in "D" dormitory. The inmate living area was not air-conditioned and could get quite warm in the summer months. Mr. Sawyer remained at Buncombe Correctional Center until his death on July 4, 1999.
4. On July 3, 1999, Mr. Sawyer was taken to Sgt. Rick Terry, the Officer in Charge, with complaints of chest pain, pressure in his chest, pain going down his left arm, and profuse sweating. After talking with and observing Mr. Sawyer to assess the situation as prison policy required, Sgt. Terry determined it was an emergency and called 911 to have EMS dispatched to Buncombe County Correctional.
5. At 9:35 p.m. on July 3, 1999, Mr. Sawyer was transported to Mission St. Joseph's Hospital emergency room by EMS. EMS administered nitroglycerine to Mr. Sawyer on the way to the hospital. The nitroglycerine resolved the chest pain and Dr. Gail Pignatiello noted in the hospital records that Mr. Sawyer was not having discomfort upon her review of him. Officer Lovelace accompanied Mr. Sawyer to the hospital as required by the Department of Correction policy and procedure to protect the inmate and the public.
6. Mr. Sawyer was seen by Dr. Gail Pignatiello, the emergency room doctor at Mission St. Joseph's Hospital, who ran several tests. Dr. Gail Pignatiello's notes indicate, "I suspect that he may have some reflux problems. I will start him on Prilosec. CBC, chemistry panel, CK-MB and troponin were all normal. ECG was normal sinus rhythm with no acute changes and the chest x-ray was unremarkable." Assessment says "Acute chest pain, resolved."
7. Mr. Sawyer was released from the hospital and arrived back at Buncombe Correctional Center at approximately 1:30 a.m. on July 4, 1999.
8. When inmates return from hospital visits, the medical records are sealed and the only documents available to the Department of Correction staff are Emergency Department Discharge Instructions and any prescriptions for medications. In Mr. Sawyer's case, the discharge instructions noted under the standardized instructions section "CP/abd pain" and under the other instructions section was noted "avoid milk, fried or fatty foods, return for problems." Dr. Pignatiello testified in her deposition that copies of the standardized instructions are given to the patient along with the discharge instructions. She went on to say that "My nurses do this. I do not know who was actually given the paperwork." There is no corroborative evidence before the undersigned that the copies of standardized instructions, which were marked as Plaintiff's Exhibit No. 2 in Dr. Pignatiello's deposition, were ever given to Mr. Sawyer. Dr. Pignatiello did not give them to him and no nurses testified to having given them to Mr. Sawyer or Officer Lovelace. Plaintiff's Exhibit No. 2 was not included in any of the medical records in this matter and has not been considered by the undersigned.
9. The only other instructions on the discharge sheet were under Follow-up Plan and said "Referred to Turpin," who is the primary physician at Buncombe County Correctional. The discharge instructions are not sealed with the rest of the medical records. The sealed medical records and discharge instructions are placed in the medical box to be picked up by the Department of Correction nurse. The nurse reviews the records to see what was done and if anything else needs to be done in follow-up to the hospital visit. The nurse then places the medical records with the inmates' records. Until the records are picked up by the nurse, they remain in the medical box and are available to the sergeants if they need to reference the discharge instructions.
10. Officer Forbes worked third shift from 10:00 p.m. to 6:00 a.m. He saw Mr. Sawyer in the dorm sometime after 3:00 a.m. on July 4 and Mr. Sawyer complained of some pain in his chest and left wrist. Officer Forbes asked Mr. Sawyer to step to the control office, which is where the officer in charge is stationed. Officer Forbes walked with him to the office and then stepped out of the office so that Mr. Sawyer and Sergeant Strickland could talk freely. Officer Forbes then walked back to the dayroom with Mr. Sawyer and gave him some Maalox and an extra pillow to prop up on. Shortly after that, while making his rounds, Officer Forbes thought he saw Mr. Sawyer in the bathroom throwing up, so he went to get Sergeant Strickland. The two of them went to the bathroom and it turned out to be another inmate. They went to the dorm and found Mr. Sawyer in his bunk and he appeared to be resting peacefully. Officer Forbes did not see Mr. Sawyer during the remainder of his shift.
11. Officer Wilds worked first shift from 6:00 a.m. to 2:00 p.m. and did not recall seeing Mr. Sawyer on July 3. During lineup before the shift began on July 4, Officer Wilds said they were told that Mr. Sawyer had been returned from the hospital and had acid reflux. Officer Wilds saw Mr. Sawyer in the bathroom area near the sinks at about 9:00 a.m. and Mr. Sawyer mentioned going to the hospital the night before and wanted to know if his prescription had been picked up. Officer Wilds indicated that Mr. Sawyer did not appear to be in any distress at that time.
12. Sergeant Terry, who had sent Mr. Sawyer to the hospital on July 3, returned to Buncombe Correctional Center on July 4 to work his 1:45 p.m. to 10:00 p.m. shift. The first shift sergeant briefed Sergeant Terry regarding Mr. Sawyer's condition upon his return from the hospital and indicated that Mr. Sawyer had been diagnosed with acid reflux. Sergeant Terry said the first time he saw Mr. Sawyer was during visitation at approximately 3:00 p.m. Mr. Sawyer's mother, Sandra Dale Helton, approached Sergeant Terry and indicated that her son was not feeling well and he informed her that Mr. Sawyer could approach any staff and they would bring Mr. Sawyer to his office. Mr. Sawyer never came to Sergeant Terry's office. Sergeant Terry said he could see Mr. Sawyer from his desk and that "Mr. Sawyer appeared to be having a normal visit to myself. I didn't see any heavy sweating, I didn't see anything that would concern me." Sergeant Terry said Mr. Sawyer never complained of any health problems to him during his July 4th shift and stated, "The — I'm going to call them symptoms — that he was having at that particular time was nothing like what he had the night before."
13. Sergeant Terry next saw Mr. Sawyer when the officer assigned to the dormitories called and said that there was an inmate down in D dorm. When he arrived Officer Anderson was having some inmates assist getting Mr. Sawyer off his bunk and onto the floor. Sergeant Terry evacuated the dorm and he and Officer Anderson started CPR. Sergeant Terry contacted a third officer and instructed him to call 911, while he and Officer Anderson continued CPR until the emergency medical technicians arrived.
14. Mr. Sawyer was transported by EMS to Mission St. Joseph's Hospital. EMS continued CPR on the way to the hospital along with high-dose epinephrine, multiple defibrillations, chest compressions, and intubation. According to the Emergency Department Record, Mr. Sawyer arrived at the hospital and was placed on an IV, oxygen, and monitor. CPR was continued with chest compressions and ventilation. Mr. Sawyer was declared dead at 8:37 p.m. on July 4, 1999, the Medical Examiner was notified, and the patient was discharged to the morgue.
15. Sergeant Terry testified that he did see the Emergency Department Discharge Instructions on July 4, but that it was after Mr. Sawyer had "expired" and during part of Mr. Johnson's investigation when he first saw the Emergency Department Discharge Instructions. Sergeant Terry had been advised by the first shift sergeant, Sergeant Hood, that Mr. Sawyer had been diagnosed with acid reflux and had been prescribed Prilosec.
16. Dr. Dave Thomas, Director of Health Services for the Florida Department of Correction and board certified in ophthalmology and correctional medicine, testified that the guards at Buncombe Correctional Center acted according to the policies and guidelines established by the North Carolina Department of Correction. He went on to say that Mr. Sawyer presented with symptoms of a heart attack and was sent out to an emergency room. Mr. Sawyer returned from the emergency room with directions concerning epigastric distress and acid reflux. Mr. Sawyer presented with the same, but milder, symptoms and was taken to the officer in charge, who has to determine if there is an emergency. The officer in charge had the "very weighty opinion of a medical expert at a hospital making a determination" and there would have to be a dramatic change in symptoms for him to declare another emergency. The officers gave Mr. Sawyer some Maalox and an extra pillow, which Dr. Thomas indicated was the proper care for acid reflux or heartburn.
17. Dr. Barbara Pullman was medical director for the North Carolina Department of Correction Division of Prisons from November 1996 through the end of January 2001. Dr. Pullman described her duties as an administrative role responsible for the review and development of policies and procedures regarding the medical care of inmates throughout the state of North Carolina. Dr. Pullman testified, "the officers acted appropriately and promptly in how they allowed Mr. Sawyer access to health care." She went on to say that acid reflux and heartburn are almost never considered emergencies, because they are not considered life-threatening conditions.
18. Dr. Thomas Griggs, board certified in cardiology, upon reviewing the medical records determined that Mr. Sawyer died from an acute myocardial infarction with a ventricular fibrillation. He went on to say that "he had arteriosclerosis primarily in the left descending coronary artery. More than likely at some point there was an ulceration or rupture of the plaque over the arteriosclerotic section with formation of a blood clot, occlusion of the artery and then the muscle perfused by that artery became ischemic and then because of that at some point an abnormal rhythm that failed to allow his heart to pump and he died."
19. Dr. Griggs testified "that the people [prison guards] who were responsible for him were not physicians, had been told that he had indigestion, and managed him appropriately from that perspective."
20. Dr. Michael Smith, board certified in general surgery and medical director at the emergency room at Betsy Johnson Memorial Hospital, testified that Dr. Pignatiello did not meet the standard of care by allowing the patient to go home. Dr. Smith went on to say that Dr. Pignatiello failed to comply with the requisite standard of care by not admitting the patient at least for observation to rule out some sort of ongoing cardiac ischemic event when there was a history very consistent with some type of cardiac ischemic event and she had an EKG which was consistent with some type of cardiac ischemic event.
21. Dr. Pignatiello was never an employee of the State.
22. The State never contracted with Dr. Pignatiello to provide medical services.
23. No agency relationship ever existed between the State and Dr. Pignatiello.
 ***********
Based upon the forgoing findings of fact, the Full Commission concludes as follows:
 CONCLUSION OF LAW
There was no negligence on the part of any named officer, involuntary servant or agent of the State while acting within the scope of his or her office, employment, service, agency or authority which proximately caused plaintiff an injury, and therefore plaintiff is entitled to no damages. N.C. Gen. Stat. § 143-291; Taylor v. N.C. Department of Correction,88 N.C. App. 446, 363 S.E.2d 868 (1988).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 ORDER
1. Plaintiff's claim must be, and hereby is, DISMISSED.
2. Each side shall bear its own costs.
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/_____________ PAMELA T. YOUNG COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER